**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

AIDA PEREZ *et al.*, on behalf of themselves and all others similarly situated,

    Plaintiffs

        v.

EQUITY PRIME MORTGAGE, LLC,

    Defendant

Case No. 1:25-CV-10841-MJJ

---

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AGREEMENT

Defendant Equity Prime Mortgage, LLC ("EPM") seeks to enforce a settlement agreement between the Parties. After verbally agreeing to all material terms of a comprehensive class settlement, class counsel tried to renege on the deal and increase the settlement amount by making the amount contingent on a maximum number of "work weeks" for the classes at issue. This effort to renegotiate the terms of an agreed-upon settlement should not be permitted. The Court should enforce the terms agreed upon by the Parties.

### PROCEDURAL AND FACTUAL BACKGROUND.

The law firm of Shavitz Law Group P.A. ("Shavitz Law") contacted EPM in December 2024 alleging that they represented current and/or former employees of EPM with respect to potential claims of employee misclassification and failure to pay wages consistent with the Fair Labor Standards Act ("FLSA") and various state laws. Kreiner Decl., ¶ 4. Prior to Plaintiff filing any action, counsel for EPM had numerous discussions with Gregg Shavitz, the founder of Shavitz Law, regarding the potential for pre-litigation resolution of these alleged claims. These discussions did not initially culminate in a resolution. Id. at ¶ 5. During these discussions, EPM provided

1

Shavitz Law with information on the number of individuals employed in various jurisdictions in the roles at issue.  Id. at ¶ 9.

On April 7, 2025 Shavitz Law filed a Complaint in Massachusetts asserting the above-described wage claims relating to what was described in the Complaint as the "Loan Employees" – a broad category that involves individuals who work on functional categories of "Loan Opener" "Loan Processor" and "Loan Closer[1]."  The main wage allegation in this action is that "Loan Employees" were misclassified as exempt instead of non-exempt and worked overtime for which they were not properly paid.  Herlihy Dec., ¶ 5.

EPM disputes these allegations. The Complaint filed by Shavitz Law sought to certify 4 separate classes of employees:

> All current and former employees of Defendant working as Loan Employees throughout the United States during the time period from three years prior to the filing of this Complaint through until resolution of this action.

> All current and former employees of Defendant working as Loan Employees throughout the State of New Jersey during the time period from six years prior to the filing of this Complaint through until resolution of this action.

> All current and former employees of Defendant working as Loan Employees throughout the State of New York during the time period from six years prior to the filing of this Complaint through until resolution of this action.

> All current and former employees of Defendant working as Loan Employees throughout the State of Massachusetts during the time period from three years prior to the filing of this Complaint through until resolution of this action.

See Compl. at ¶¶ 56, 67, 78, 89; Kreiner Dec., ¶ 6.

After the Complaint was filed in this matter, EPM's counsel engaged in further settlement discussions with Attorney Shavitz and other attorneys at Shavitz Law.  Kreiner Dec., ¶ 7. The

---

[1] The other action is pending in Georgia and deals with underwriters.

parties ultimately agreed to mediate the present case with Dennis Clifford, a mediator with offices in Texas and Florida.  Id. at ¶ 8 and Herlihy Dec., ¶ 4.

Prior to the mediation, Shavitz Law requested certain information about the alleged classes described in the Complaint in this matter.  Shavitz Law initially sought information about the location of employees in the potential class, the number of employees, and average wage and salary information.  Attorney Kreiner provided this information from 2023 to 2025 for a list of particular job titles.  Kreiner Dec., ¶ 9.

Subsequently, Shavitz Law specifically asked for the "work weeks" for the potential class members, i.e., the total number of weeks worked by the members of the potential class during the statute of limitations period.  Herlihy Dec., ¶ 7.  "Work weeks" is a rough estimate of the total number of weeks worked by a potential "class" of employees using the start and end dates of employment for the potential class members.  Id. However, a calculation of "work weeks" does not reflect a variety of factors that would impact the amount of overtime allegedly worked even if the allegations are true, including variations amongst employee schedules, vacations, state holidays, leaves of absence and other factors that impact how much any individual employee works.  Id. at ¶ 8.

Attorney Herlihy had numerous conversations with Paolo Meireles, counsel for the alleged class, sharing that EPM could not readily obtain "work week" information for the entire period alleged in the Complaint prior to the mediation.  Id. at ¶ 9.  Attorney Herlihy gave detailed information as to why that was the case.  Id. at ¶ 10.  Specifically, the period at issue is 2-6 years depending on the jurisdiction and whether the conduct is found to be "willful" under the FLSA. Id.  During that period of time, EPM used three different payroll systems.  Id.  The most recent system was Paycom, which EPM started using as of January 1, 2023.  Id.  Prior to the mediation, EPM had the ability to pull data from Paycom for employees employed as of January 1, 2023.  Id.

3

Detailed data was not readily accessible prior to the mediation from the prior two payroll systems used by EPM.  Id.

EPM provided the requested work week estimate on July 24, 2025 from Paycom data, but made it clear, repeatedly, that because of payroll system changes, the information readily available to calculate work weeks for the "Loan Employees" prior to the mediation was limited and that the calculation at this point was an estimate that required extrapolation of data for periods prior to 2023 using data from 2023 forward.  Id. at ¶ 11 and Exhibit A.  EPM made it clear that it thought the work weeks may be overstated based on how it was calculated, but noted that the data was "being provided in good faith for settlement purposes only, and without full review of factors that may impact the calculation."  Id.  In short, EPM made it clear that the number of work weeks could not be calculated with accuracy at that time and that EPM was providing good faith information that could be incorrect.

The parties were not able to resolve this matter at mediation, but continued settlement discussions thereafter.  Kreiner Dec., ¶ 11; Herlihy Dec., ¶ 12. The settlement discussions related to settlement of all of the class claims in the Complaint.  Id.  Several motions to stay were filed, and granted, in this case specifically for the purpose of continuing settlement discussions.  Herlihy Dec., ¶ 13. Discussions continued between and amongst EPM's counsel and Attorney Shavitz and his co-counsel, Paolo Meireles.  Id. at ¶ 14.

On August 19, 2025, after a call between EPM's counsel and Mr. Shavitz, Mr. Shavitz made a proposal in an email to resolve claims of the purported "Loan Employee" classes.  This email confirms that the settlement discussions were, at all times, about resolution of the "Loan Employee" classes as alleged in the Complaint in its entirety.  See Kreiner Dec., ¶ 12; Herlihy Dec., ¶ 15 and Exhibit B.

EPM's counsel spoke directly with Mr. Shavitz on August 22, 2025.  During that call they agreed to resolve all the claims alleged in this matter as a class settlement for $660,000.00.  Kreiner Dec., ¶ 13. There was no discussion on this call about making the settlement contingent on a certain amount of "work weeks."  Id.  All material terms were agreed on the call, including the amount of the settlement funds to be allocated to legal fees, that the settlement would be distributed on a reversionary basis, that EPM would consider a transfer of the matter, and that the opt-in Plaintiffs would receive an additional benefit.  At all times during negotiations and leading up to agreement on final terms, Shavitz Law was expressly told that the "work week" data was incomplete.  Knowing that this information was uncertain, Shavitz Law proceeded to finalize the material settlement terms.  Herlihy Dec., ¶ 17.

EPM's counsel received a term sheet from Mr. Meireles on August 25, 2025.  For the first time, that term sheet made the settlement "contingent" on the class consisting of a certain number of "work weeks."  Herlihy Dec., ¶ 18 and Exhibit C. The number of work weeks referenced by Shavitz Law was different than the estimate that had been given to Shavitz Law pre-mediation on July 24, 2025. This had not been discussed either in individual negotiations or at mediation.  See Id. at ¶ 18.

Shavitz Law agreed on terms after EPM made clear it had only provided an estimate of work weeks that was not based on complete data and that could be incorrect.  Id. at ¶ 19. All discussions about resolution, including the final discussion where Mr. Shavitz and EPM's counsel agreed on a final number and fee allocation, discussed resolution of all claims asserted in the present matter, including the scope of claims contemplated by the four alleged classes.  Id.

A red-line back to Shavitz Law made some minor edits to non-material terms and deleted the unilaterally introduced contingency.  Id. at ¶ 20 and Exhibit D.  The parties resolved all other

issues in the term sheet.  The contingency was never part of the terms of the settlement reached verbally by the parties.  The settlement terms, which were reached after extensive negotiation, should be enforced.  Attorney Herlihy had subsequent discussions with Attorney Meireles.  Id. at ¶ 21.  During all of those discussions, Attorney Herlihy took the position that the parties were fully settled and all material terms decided.  Id.  For the first time during these discussions, counsel for the purported class attempted to argue that the settlement was contingent on the "work week" number that Shavitz Law had been repeatedly told was an extrapolation based on limited data.  Id.  While Attorney Meireles repeatedly tried to "carve" back the claims to be resolved, EPM maintained throughout that there was an enforceable settlement.  Id.

## ARGUMENT

The Court should enforce the settlement agreement reached by the parties.  As an initial matter, "[s]ettlement agreements enjoy great favor with [this Circuit] 'as a preferred alternative to costly, time-consuming litigation.'" Maccarone v. Siemens Indus., No. 25-1219 (1st Cir. Jan 29, 2026) quoting Fid. and Guar. Ins. v. Star Equip. Corp., 541 F.3d 1, 5 (1st Cir. 2008).  "The solemnity with which the federal courts approach settlement agreements cannot be overstated."  Abdullah v. Evolve Bank & Tr., No. CA 14-141 S, 2015 WL 4603229 (D.R.I. July 29, 2015) quoting Silicon Image, Inc. v. Genesis Microchip, Inc., 271 F. Supp. 2d 840, 846 (E.D. Va. 2003).

The only consideration for the Court is whether, even with an oral agreement, all material terms were agreed.  If it is the case that all material terms are agreed, EPM has a right to have the settlement agreement enforced.  See Maccarone, supra.  The fact that a written agreement does not exist "does not preclude enforcement of the settlement agreement by the district court."  See Roman Oliveras v. P.R. Elec. Power Auth. (PREPA), 797 F.3d 83, 85 n.2, 87 (1st Cir. 2015) (affirming enforcement of an oral settlement agreement); Commw. School,

6

Inc. v. Commw. Acad. Holdings LLC, 994 F.3d 77, 86 (1st Cir. 2021) ("[a]s a general matter, oral settlement agreements are enforceable as long as the parties have mutually assented to all of their material terms.") citing Quint v. A.E. Staley Mfg. Co., 246 F.3d 11, 15 (1st Cir. 2001); Harmon v. Journal Publ. Co., 476 Fed. Appx. 756, 757 (5th Cir. 2012) (settlements are not required to be reduced to writing and oral settlement agreements are enforceable ). Even where a party refuses to sign the document which evinces the terms of an oral agreement, such a refusal does not form a basis to deny enforcement. See Roman Oliveras, 797 F.3d at 85 n.2, 87.

Here, all material terms were agreed upon. The resolution reached was of all classes and all claims, as reflected in paragraph 3 of the Term Sheet noting that the settlement amount

> … covers and includes all state and federal Wage and Hour claims of all Putative Collective Members and all attorneys' fees and expenses of Plaintiff's counsel, general release payments, and the expenses of the settlement administrator.

The total amount to be paid was agreed. The amount allocated to attorneys' fees and general release payments was agreed. The basis on which opt-in class members would be paid, including the tax allocation and liability, was agreed. The parties agreed to the settlement fund being distributed on an opt-in, reversionary basis.[2] These are the material terms of the settlement and agreement to them created an enforceable agreement.

Plaintiff's counsel attempted to add a "condition" to the settlement amount agreed upon after agreement had been reached, i.e., a maximum number of work weeks. That addition – to condition the settlement amount to a maximum number of work weeks, was never agreed upon. It reflects nothing more than a recalculation by Plaintiff's counsel, after an agreement, of what they would accept as settlement. A party's "change of heart" does not provide grounds to undo

---

[2] EPM initially suggested a redline adding hourly rate as a factor, but did not pursue that edit.

7

a settlement.    See Quint, 246 F.3d at 12-15 (affirming enforceability of oral settlement agreement despite plaintiff's desire to "withdraw from the settlement" and "back out").    A "change of heart" is exactly what is reflected in portion of paragraph 2 in the Term Sheet after the first five words.    This change of heart should not be permitted to undermine a deal that was already stricken.

Plaintiff's counsel will likely argue that their agreement to the settlement relied on information from EPM about work weeks in entering into the settlement.    That argument cannot sustain either their inclusion of a contingency in the agreement that was not discussed or their refusal to comply with the oral settlement agreement.    The contingency, which would clearly have been a material term, was never discussed or documented during the negotiations or referenced when the agreement.    It cannot be unilaterally added after agreement was reached.

It is also not reasonable for Plaintiff's counsel to rely on the work week information in their calculation of whether or not to enter into the settlement.    Settlements, particularly in employment matters, are reached all the time without the parties having full information.    Here, EPM noted, in writing, that it did not have access at the time of the negotiations to information that would allow it to confirm work weeks for the classes at issue.    Plaintiff's counsel, after having been told of this data issue, nevertheless pressed for work week information.    After this pressure, EPM provided the information it had but expressly disclaimed that information as being based on incomplete data and an extrapolation.    Plaintiff's counsel elected to proceed anyway and cannot now claim to have relied on information they were told was not reliable.

In similar cases parties have sought to rescind or avoid settlement agreements or other contracts because information was not fully known or one party relied on an assumption. Courts have enforced settlement agreements despite these arguments.    La Fleur v. C.C. Pierce Co., Inc., 398 Mass. 254, 258 (1986) (settlement contract will "not be rescinded for mutual

mistake where one party was aware at the time the contract was signed that he had limited knowledge as to essential facts, but nonetheless assumed the risk that circumstances would prove to be other than as expected"); <u>Vasconcellos v. Arbella Mut. Ins. Co.</u>, 67 Mass. App. Ct. 2777, (Mass. App. 2006) (insurer made oral offer to pay for property damage without verifying that damaged car was covered by policy, insured accepted offer, and court enforced oral agreement despite car not falling within definition of covered auto in the contract).

As the First Circuit noted just weeks ago in enforcing a settlement in a class action:

> Federal judges in the five districts within the First Circuit are extremely busy. Just as parties to litigation expect judges to diligently manage their dockets, a federal judge's highly congested calendar cannot be manipulated by disgruntled litigants … who have second thoughts after settlement.

<u>Maccarone</u>, No. 25-1219 (1st Cir. Jan 29, 2026).  As discussed below, a "disgruntled" plaintiff, like the plaintiff in <u>Maccarone</u>, is precisely what is at issue here.  Plaintiff's counsel agreed to a resolution for the claims of four classes that <u>they had defined</u> with limited information on the scope of those classes.  They should not now be permitted to back out of an agreed upon settlement because they failed in their due diligence before agreeing to a settlement.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should enforce the settlement agreement.

March 17, 2026

RESPECTFULLY SUBMITTED,
EQUITY PRIME MORTGAGE, LLC

By its counsel:

<u>/s/ Sarah B. Herlihy</u>
Sarah B. Herlihy (BBO # 640531)
sherlihy@herlihylawllc.com
Herlihy Law LLC
54 Piedmont Street
Boston, MA  02116
(617) 755-3869

9

## LOCAL RULE 7.1 CERTIFICATION

Undersigned counsel certifies that they conferred with Plaintiff's counsel prior to filing this motion in a good faith attempt to resolve or narrow the issue.

/s/ Sarah B. Herlihy
Sarah B. Herlihy

## CERTIFICATE OF SERVICE

I certify that on March 17, 2026, I served a copy of the foregoing document on counsel for the Plaintiff using the Court's ECF system.

/s/ Sarah B. Herlihy
Sarah B. Herlihy

10