**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| AIDA PEREZ *et al.*, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Case No. 1:25-CV-10841-MJJ |
| -against- | |
| EQUITY PRIME MORTGAGE, LLC, | |
| Defendant. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S**
**MOTION TO ENFORCE SETTLEMENT AGREEMENT [ECF No. 35]**

Plaintiffs, on behalf of themselves and all others similarly situated (together, "Plaintiffs"), by and through their attorneys, Shavitz Law Group, P.A. and Fair Work, P.C., hereby file their Opposition to Defendant's Motion to Enforce Settlement Agreement [ECF No. 35] (the "Motion").

Respectfully submitted this 1st day of April, 2026, by:

Paolo Meireles*
Tamra Givens*
SHAVITZ LAW GROUP, P.A.
622 Banyan Trail, Suite 200
Boca Raton, FL  33431
(561) 447-8888
pmeireles@shavitzlaw.com
tgivens@shavitzlaw.com

Hillary Schwab (BBO# 666029)
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3261
hillary@fairworklaw.com

**Pro Hac Vice* Admitted

**Attorneys for Plaintiffs and the Putative Collective and Class**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................ iii

    I. INTRODUCTION .................................................................................................... 1

    II. RELEVANT FACTS AND PROCEDURAL POSTURE ..................................................... 1

        A. Workweek Data is the Necessary Premise for Any Settlement Discussions. ................. 1

        B. Defendant Endeavored to Pull the "Actual" Workweek Data to Permit Settlement Discussions Premised on L*ess Than* 20,000 Workweeks at Issue. ................................. 3

        C. The Parties Negotiated Based on 10,889 Workweeks in the Three-Year Period. ............ 4

        D. Negotiation of Material Terms – Resolution Was Not Reached ................................... 5

        E. Defendant Retrieves Additional Data to Facilitate Settlement. ....................................... 7

        F. Settlement Discussions End and Litigation Ensues. ..................................................... 8

    III. ARGUMENT AND ANALYSIS ................................................................................. 11

        A. The Parties Have Not Reached an Agreement. .......................................................... 11

            1. Applicable standards ..................................................................................... 11

            2. The Parties did not agree as to *all* material terms. ....................................... 12

                *Material Term 1: Scope included in the fund.* ....................................... 13

                *Material Term 2: The liability period and associated release.* ........... 14

                *Material Term 3: Timing of settlement payments.* ............................... 15

                *Material Term 4: Settlement Administrator* ......................................... 16

                *Material Term 5: Allocation of individual settlement shares.* .............. 16

                *Material Term 6: Tax allocation on settlement payments.* ................... 16

                *Material Term 7: Venue for settlement approval.* ................................. 17

            3. Defendant was clear that there had been no agreement reached. ............................. 17

            4.The Parties' conduct during and after settlement negotiations demonstrates they had not reached a resolution.................................................................................... 18

        B. Even If An Agreement Were Enforced, It Is Unlikely Any Court Would Find This Resolution To Be Fair and Reasonable Under These Circumstances. ........................... 19

    IV. CONCLUSION ...................................................................................................... 20

CERTIFICATE OF SERVICE ............................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Team Prior, Inc.*,
  No. 19 Civ. 00452, 2021 U.S. Dist. LEXIS 162626 (D. Me. Aug. 27, 2021) .............................19

*Arias v. Family First Funding, LLC*,
  No. 23 Civ. 1226, 2025 LX 244820 (D.N.J. July 1, 2025) ...........................................................14

*Belk v. Le Chaperon Rouge Co.*,
  No. 18 Civ. 1954, 2020 U.S. Dist. LEXIS 117985 (N.D. Ohio July 6, 2020) .................12, 15, 16

*Cherenfant v. Carb/Americas, Inc.*,
  No. 05 Civ. 61256, 2006 U.S. Dist. LEXIS 113812 (S.D. Fla. May 3, 2006) .............................14

*Clark v. Mitchell*,
  937 F. Supp. 110 (D.N.H. 1996) ...................................................................................................13

*Commonwealth Sch., Inc. v. Commonwealth Acad. Holdings LLC*,
  994 F.3d 77 (1st Cir. 2021) ...........................................................................................................18

*Confederate Motors, Inc. v. Terny*,
  831 F. Supp. 2d 414 (D. Mass. 2011) ...........................................................................................14

*D'Agostino v. Fed. Ins. Co.*,
  969 F. Supp. 2d 116(D. Mass. 2013) .................................................................................15, 16, 17

*Davis v. Deutsche Bank Nat'l Tr. Co.*,
  No. 12 Civ. 11738 , 2015 U.S. Dist. LEXIS 192504 (D. Mass. July 27, 2015) ...............15, 16, 17

*Foss v. City of New Bedford*,
  621 F. Supp. 3d 203 (D. Mass. 2022).......................................................................................*passim*

*Ikossi v. St. Mary's Reg'l Med. Ctr.*,
  No. 22 Civ. 00023, 2025 LX 255503 (D. Me. July 11, 2025) .......................................................16

*La Fleur v. C.C. Pierce Co.*,
  398 Mass. 254 (Mass. 1986) .........................................................................................................14

*Laundry Co. v. New Eng. Teamsters & Trucking Indus. Pension Fund*,
  829 F.2d 278 (1st Cir. 1987). ................................................................................18

*Maccarone v. Siemens Indus.*,
  165 F.4th 640 (1st Cir. 2026)..............................................................11, 15, 16

*Malave v. Carney Hosp.*,
  170 F.3d 217 (1st Cir. 1999) ............................................................................11

*Malek v. Verizon Communs., Inc.*,
  No. 2 Civ. 30164, 2004 U.S. Dist. LEXIS 976 (D. Mass. Jan. 27, 2004). ..............................12, 17

*Metcalf v. Bay Ferries Ltd.*,
  110 F. Supp. 3d 302 (D. Mass. 2015)..............................................11, 13, 14, 15

*Mongue v. Wheatleigh Corp.*,
  No. 18 Civ. 30095, 2024 LX 220459 (D. Mass. Apr. 16, 2024). ....................................19

*Preston v. World Travel Holdings, Inc.*,
  No. 23 Civ. 12389, 2024 U.S. Dist. LEXIS 123879 (D. Mass. July 15, 2024) ............................19

*Quint v. A.E. Staley Mfg. Co.*,
  246 F.3d 11 (1st Cir. 2001) ..............................................................................15

*United States ex rel. Allen v. Alere Home Monitoring, Inc.*,
  355 F. Supp. 3d 18 (D. Mass. 2019) ..............................................................11, 18

*Vasconcellos v. Arbella Mut. Ins. Co.*,
  67 Mass. App. Ct. 277 (Mass. 2006) ..............................................................14

**Statutes**

Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ..................................................*passim*

## I. INTRODUCTION

In this Fair Labor Standards Act ("FLSA") unpaid wage putative collective action, Defendant asks this Court to "enforce" an alleged "oral agreement" – but tellingly does not identify its specific terms. Instead, it refers the Court to a heavily redlined (by both parties) draft Term Sheet reflecting ongoing negotiations of material terms. Because the parties were never able to reach agreement, orally or in writing thereafter, there is no agreement to enforce. As detailed *infra*, (i) the Parties never had a meeting of the minds with respect to *all* material terms; and (ii) assuming otherwise— which is false—the settlement could not be approved as fair, adequate, and reasonable, as required by FLSA jurisprudence. For these reasons, and as otherwise *infra*, the Motion should be denied.

## II. RELEVANT FACTS AND PROCEDURAL POSTURE[1]

### A. <u>Workweek Data is the Necessary Premise for Any Settlement Discussions.</u>

1. On December 12, 2024, Plaintiffs wrote Defendant to engage in pre-litigation settlement discussions on behalf of a proposed collective of exempt "underwriters." Declaration of Paolo C. Meireles ("Meireles Decl.") at ¶ 1. On January 18, 2025, Plaintiffs' counsel advised that they had been retained by several "loan closers," bringing similar claims. *Id*. Plaintiffs' counsel intended two, separate collective actions: this matter, *Perez, et al. v. Equity Prime Mortgage, LLC*, No. 25 Civ. 10841 (D. Mass.) ("*Perez*"), on behalf of exempt "Loan Employees," and *Brown v. Equity Prime Mortgage, LLC*, No. 25 Civ. 01832 (N.D. Ga.) ("*Brown*") on behalf Underwriters.

2. Before the lawsuits were filed, the parties discussed potential resolution. Meireles Decl. at ¶ 2. On January 29, 2025, Plaintiffs identified the data necessary for them to value

---

[1] The information relevant to this opposition constitutes confidential settlement communications pursuant to Fed. R. Evid. 408. While Rule 408 evidence "is not admissible . . . to prove or disprove the validity or amount of a disputed claim[,] . . . [t]he court may, however, admit this evidence for another purpose[.]" *Aiello v. Signature Commer. Sols., Inc.*, Civil Action No. 23-cv-11930-ADB, 2024 LX 85323, at *7 (D. Mass. Mar. 25, 2024) (internal brackets omitted). Plaintiffs submit this information to demonstrate the Parties did not reach agreement on all material terms of a settlement and also to provide relevant information Defendant did not provide in its submission.

settlement, including, among other things, the number of **workweeks** worked for each putative collective member during the three-year limitations period. *Id.* In short, and contrary to Defendant's suggestion (Motion at 3), **workweeks** were the key element of discussions from the start. *Id.* That is because, in an FLSA unpaid wage matter, the number of workweeks directly correlates to the alleged wages due (i.e., unpaid overtime hours per **week** x overtime rate = unpaid wages due). *Id.*

3. The parties did not settle and *Perez* and *Brown* were filed on April 7, 2025. *Id.* at ¶3.

4. On April 9, 2025, the Parties again conferred regarding mediation and the data needed to support an exposure analysis. *Id.* at ¶ 4. Plaintiffs reiterated that to mediate, they would need data showing the "total weeks at issue." Exhibit 1 (correspondence) at p. 1.[2]

5. On May 13, 2025, the Parties agreed to mediate on June 10, 2025 with Dennis Clifford. Meireles Decl. at ¶ 5. Leading up to mediation the Plaintiffs followed up several times regarding the workweek data necessary for mediation. *See, e.g.*, *id.* (on May 13, 2025, noting the data was needed at least 2 weeks prior to mediation; on May 23 and 30, 2025, inquiring on status of the data; on May 30, 2025, Defendant stated data to be produced "by close of business" June 2).

6. By day's end June 2, 2025, Defendant had not produced the workweek data and sought to adjourn the mediation to permit additional time. *Id.* at ¶ 6. The mediation was reset to June 19, 2025 and the Parties continued to discuss the workweek data. *See, e.g.*, *Id*.

7. Finally, on June 11, 2025, Defendant produced *some* of the data needed. Exhibit 2 (correspondence) at p. 1. However, the production did not include necessary workweek data; rather, it only reflected "fulltime equivalent" employee data (i.e., the number of employees in a particular role within a calendar year). Meireles Decl. at ¶ 7. Plaintiffs followed up with several questions:

> (1) Is this nationwide data? (2) Is the data forthcoming for NY and NJ's extended six year limitations periods? (3) We need the **total workweeks** as well to be able to run any numbers on this. **Or is the idea that these represent full-time equivalents**

---

[2] All Exhibits herein are attached to concurrently filed Meireles Decl.

2

> **throughout the indicated year (i.e., assume each employee has a total of 52 weeks for that year)**?"

Exhibit 2 at p. 1 (emphasis added).

8.      On June 12, 2025, Plaintiffs submitted their *initial* mediation statement to Mediator Clifford. In this statement, Plaintiffs explained to Mr. Clifford, as they had to Defendant, that Defendant had "not produced data sufficient to permit a valuation" on a nationwide basis. Plaintiffs copied Defendant's counsel on this letter. Meireles Decl. at ¶ 8.

9.      On June 16, 2025, three days before mediation, Plaintiffs asked Defendant whether workweeks would be produced. *Id*. at ¶ 9. Because Defendant had not produced this data, the Parties discussed how they might *estimate* the necessary workweeks information using "full-time equivalents" data Defendant had produced. *Id*. Plaintiffs warned that absent the *actual* weeks data, a full-time equivalents analysis would significantly overestimate weeks and damages exposure. *Id*. On June 16, Plaintiffs provided Mr. Clifford and Defendant a supplemental mediation statement using these estimates. *Id*. Based on these assumptions, Plaintiffs concluded the data reflected 397 loan employees with approximately 20,644 workweeks during the 3-year FLSA statute of limitations. Plaintiffs estimated Defendant's exposure based on these assumptions. *Id*.

10.     Defendant took *extreme* issue with Plaintiffs' workweeks estimate and related exposure calculations, claiming it was "filled with multiple inaccuracies" and explaining the data provided was "not complete, and [did] not paint a complete picture." *Id*. at ¶ 10.[3]

**B. Defendant Endeavored to Pull the "Actual" Workweek Data to Permit Settlement Discussions Premised on *Less Than* 20,000 Workweeks at Issue.**

11.     On June 17, 2025, Defendant again requested to reschedule mediation to permit

---

[3] In fact, Defendant was so offended at the suggestion that the workweeks could be anywhere *near* 20,000 that following this exchange, Defendant's Attorney Kreiner advised that he refused to speak to Plaintiffs' counsel, Paolo Meireles, any further, and would only speak to attorney Gregg Shavitz of the Shavitz Law Group. *Id.* at ¶ 10 n. 1. As a result, much of the remainder of the parties' discussions are attested to by Attorney Shavitz, not Attorney Meireles.

additional time to collect data.  Shavitz Decl. at ¶ 5.

12.     The parties rescheduled mediation for August 1, 2025.  Plaintiffs continued to follow up with Defendant about the status of the needed workweek data with no success. Shavitz Decl. at ¶ 6; Meireles Decl. at ¶ 12; Exhibit 3 at 5 (reflecting discussions on July 9, 16, 18, and 22, 2025).

13.     Finally, on July 24, 2026, Defendant was able to provide estimated data for part of the relevant three-year statute of limitations, that is January 1, 2023 through July 15, 2025:

> EPM reviewed information on salary and tenure for this wide range of employees from January 1, 2023 through July 15, 2025. . . . The **estimated total work weeks for the individuals employed at some point during this time period is approximately 9200**.  **This number is also likely <u>overstated</u>**[.] . . . As you can see, the "best case" scenario we see given . . . is lower than your settlement demand by many multiples.  Hopefully we can get a demand closer to reason prior to mediation.

Exhibit 3 at p. 2 (emphasis added).[4]

14.     Because Defendant's data was missing approximately 24 calendar weeks of the three-year limitations, Plaintiffs extrapolated the weeks for a final total of **10,889 weeks** in the three-year period. Plaintiffs shared their updated valuation with Defendant and the mediator, and this is the estimate upon which all further settlement communications were premised.  Meireles Decl. at ¶ 14.

15.     Importantly, this final number of workweeks at issue—10,889—which Defendant claimed was *still* "likely **overstated**" (*see* ¶ 13, *supra* (emphasis added)), represented approximately *half* of the 20,644 workweeks Plaintiffs previously calculated based on  the "fulltime equivalent" methodology. *See* ¶¶ 9-10 n. 3, *supra* (Defendant was offended by the suggestion of 20,000 weeks).

C.  **<u>The Parties Negotiated Based on 10,889 Workweeks in the Three-Year Period.</u>**

16.     The Parties finally participated in mediation on August 1, 2025.  At mediation, Plaintiffs made a number of demands premised on the 10,889 workweeks and three-year liability

---

[4] Notably, Defendant wrote the estimated workweeks "is" approximately 9,200, and the number is "likely" overstated (Exhibit 3 at p. 1); not that it "thought" it was overstated (ECF No. 35-2 ¶ 3), or that it was possibly *more than* 9,200. The opposite is true.  *See* ¶ 10, *supra*.

period.  Meireles Decl. at ¶ 16.  Although the Parties reached impasse, before breaking the mediator suggested a "mediator's bracket" of $500,000 to $1,000,000 *intended to release the 10,889 weeks* at issue, with the parties to considering continued negotiations within that bracket.  *Id*.

17.     The Parties continued to discuss possible resolution, and sought various stays to facilitate same.  *Id*. at ¶ 17; ECF Nos. 13, 17 (Motions to Stay Pending Settlement Discussions).

18.     On or about August 22, 2025, over the course of several phone conversations, the Parties agreed upon a monetary number for the a "gross settlement fund" totaling $660,000.00—that is, within the mediator's proposed bracket— to value and settle the 10,889 workweeks in the three-year period, with additional, material terms to be agreed upon via a term sheet.  Shavitz Decl. at ¶ 10.  Indeed, the majority of material terms were not agreed upon during the call (e.g., the timing of funding the settlement, individual settlement allocation formula and scope of the release, etc.).  *Id*.[5]

**D.  <u>Negotiation of Material Terms – Resolution Was Not Reached.</u>**

19.     On August 25, 2025, Plaintiffs sent Defendant a proposed MOU.  Exhibit 4 (e-mail and initial draft Term Sheet, referred to in interchangeably as Term Sheet, "MOU," or "Memorandum of Understanding")).  The draft reflected proposed material terms including:

> The Gross Fund is $660,000.00, assuming the number of workweeks covered is not more than 10,889, as identified prior to resolution of this matter.  To the extent the number of workweeks total more than 10,889, Defendant shall pay a proportional increase to the Gross Fund for each such week calculated as $660,000 / 10,889 x additional weeks above 10,889.

Exhibit 4 at Paragraph 2.  On its face, this proposal was premised on the 10,889 workweeks discussed at mediation—i.e., based upon the data that the Parties had been discussing for *months*. *See supra*.

20.     On August 26, 2025, Defendant advised it would be back in touch that week, noting it was glad the Parties were "**close** to the finish line." Exhibit 5 (e-mail) at pp. 1-2 (emphasis added).

---

[5] Defendant's sworn declarations likewise do not claim these terms were agreed upon orally, and thus concede they were not.  *See* ECF No. 35-1 at ¶ 13.

21.     On August 29, 2025, Defendant provided its counterproposals to the Term Sheet, advising they were not quite final as it still had one person yet to review and sign off, and at least one other material term reflected therein were going to "take some thought" to finalize.  Exhibit 6 (e-mail) at p. 1.  The e-mail attached Defendant's redlined edits and comments to the draft Term Sheet—i.e., their counteroffer on the *material* terms, including, among others:

(i)     Removal of the limit of 10,889 workweeks—the weeks the Parties had based their settlement discussions on up to that point. Exhibit 6 at p. 2, ¶ 2.
(ii)    A proposed change to the scope of the liability period—defined as the "Relevant Period"—from three years to "any longer period as provided by relevant state statute so as to encompass all potential claims under relevant statutes of limitation for unpaid overtime wages," and by implication, a change to the release of claims premised upon the definition of the "Relevant Period."  *Id.* at ¶ 3.
(iii)   Timing of settlement funding, i.e., whether the Gross Fund would be paid in full, or whether it would be paid in parts "as needed to timely fund payment of authorized" claims.  *Id* at ¶ 4.
(iv)    Requiring mutual selection of a claims administrator or otherwise selected by JAMS.  *Id.* at p. 3, ¶ 5.
(v)     Changes to the individual settlement award allocation formula.  *Id.* at ¶ 6.
(vi)    Questions regarding the proposed tax allocation of settlement funds.  *Id*. at ¶ 8.
(vii)   Disputes regarding the yet-to-be agreed-upon venue for approval. *Id.* at p. 4, ¶ 14.

22.     The Parties subsequently debated the material terms, with Plaintiffs issuing yet *another* counterproposal with respect to material terms on August 30, 2025.  Meireles Decl. at ¶ 22; Exhibit 7.[6]  Plaintiffs' August 30, 2025 proposal included, among others:

(i)     Re-inclusion of the maximum of 10,889 workweeks previously agreed upon, commenting, "we can't settle cases without a[n escalator] clause like this. . . . And [] you want to extend the liability period for other states and add more weeks, so we absolutely need this here."  Exhibit 7 at p. 2, ¶ 2.
(ii)    Rejecting of the expanded "Relevant Period."  *Id.* at ¶ 3.
(iii)   Proposed edits to the Defendant's changes to the funding obligations.  *Id.* at ¶ 4.
(iv)    Rejecting the claims administrator selection protocol.  *Id.* at p. 3 ¶ 5.
(v)     Rejecting Defendant's proposal on the settlement allocation formula. *Id.* at ¶ 6.
(vi)    Additional argument regarding the tax allocation of settlement funds. *Id.* at ¶ 8.
(vii)   Additional argument about the appropriate venue for approval.  *Id.* at ¶ 14.

23.     On September 2, 2025, the Parties again conferred over the material terms.  Meireles

---

[6] Defendant's Motion neglects to advise of this additional round of proposals.

Decl. at ¶ 23.  The Parties again debated the appropriate approval venue, and the settlement's tax allocations.  *Id.*  Plaintiffs also reiterated the Parties valued the claims on 10,889 weeks, and that this was the basis of the settlement discussions; had the weeks and associated release been greater, so too would the damages and monetary amount.  *Id.*  Plaintiffs also categorically rejected the attempt to, for the first time, include *all* states' longer limitations periods (including states never discussed).  *Id.*

24.     Defendant responded it was "very clear" the workweeks were extrapolated, though it went on to admit the extrapolation was only ever for a three-year period.  *Id.* at ¶ 24.[7]

25.     The Parties ended the call with Defendant agreeing it would work to confirm the actual number of weeks at issue to permit further settlement discussions.  *Id.* at ¶¶ 25-26; *See also* Exhibit 8 (e-mail) at p. 1 (discussing status of outstanding workweek data); Exhibit 9 (e-mail) p. 1; (Plaintiffs wrote, "If the case is no longer heading towards resolution, please advise"; Defendant responded, "I am hopeful we are on track for settlement.  I'm still working with the data").

**E.  <u>Defendant Retrieves Additional Data to Facilitate Settlement.</u>**

26.     On or about November 11, 2025, Defendant finished its analysis, resulting in approximately 20,000 weeks in the three-year period. Meireles Decl. at ¶ 27.  This number was very close to Plaintiffs' original assumption (which Defendant had vehemently rejected) (*see supra*); and more than double the "likely overstated" estimate of the extrapolated 10,889 weeks upon which settlement discussions were based. *Id.*; *see also* ¶¶ 9-10 n.3, 13, 13 n. 4*, supra*.

27.     Defendant insisted that the parties settle the case at $660,000, irrespective of the number of people or weeks because 10,889 weeks was always an "estimate." Defendant somehow saw no harm in now seeking to include more than *double* those weeks.  Meireles Decl. at ¶ 28.

28.     Plaintiffs disagreed. Plaintiffs explained that if the Parties could not agree upon a

---

[7] Defendant was only ever "clear" there was nowhere *near* 20,000 weeks, and 9,200 was "likely overstated." *See supra*.

narrowed scope and associated release to the original 10,889 workweeks, the matter could not settle at $660,000. *Id.* at ¶ 29.  This amount had not been accepted and was unlikely to be court approved as a fair, adequate, and reasonable resolution of the wage claims, given wide discrepancy between the data discussed during mediation and the workweek data that more closely matched reality.  *Id.*

29.     The Parties thereafter explored options for limiting the liability period to bring the number of workweeks and associated release down to 10,889 weeks.   *Id.* at ¶ 30.   On November 26, 2025, Plaintiffs proposed some options, providing new settlement offers at Defendant's request, which Plaintiffs indicated would remain open through December 23, 2025.  *Id.*

30.     On December 19, 2025, the parties again conferred in an effort to resolve the dispute. Shavitz Decl. at ¶ 12.  Plaintiffs reiterated that the negotiations were always based upon 10,889 workweeks (extrapolated from the 9,200 workweeks Defendant's disclosed).  *Id.*  Plaintiffs therefore could not now permit over 20,000 workweeks to be included in the settlement.  *Id.*   Defendant responded that the 10,889 workweeks were "always" an estimate, parties settled class actions "regularly" based on similar "estimates" (here, that is, a 50% *underrepresentation* on the actual scope of the collective), and that "sometimes you win some, sometimes you lose some."  *Id.*   Not having reached resolution, Defendant agreed to consider a further, written settlement proposal, which Plaintiffs provided through Mr. Clifford on December 20, 2025.  *Id.*; Meireles Decl. at ¶ 31.

31.     On December 22, 2025, Defendant stated that its view was that the Parties had reached the purported "oral agreement" without the mediator and that the "agreement" was enforceable."  Meireles Decl. at ¶ 32.  Plaintiffs responded again that there was no agreement. *Id.*

**F.  <u>Settlement Discussions End and Litigation Ensues.</u>**

32.     Throughout and after these discussions, the Parties continued with litigation (e.g., Defendant answered on November 1, 2025 (ECF No. 23) and the Parties filed their Joint Statement

Pursuant to Fed. R. Civ. P. 16(b) on December 3 (ECF No. 27)). The Parties also started discovery, with Defendant failing to properly respond to Plaintiffs' written discovery requests, resulting in Plaintiffs' since-granted Motion to Compel. ECF Nos. 31, 33. On December 10, 2025, Defendant served its initial disclosures. Meireles Decl. at ¶ 33. On March 3, 2026, Defendant made an extremely limited, deficient, and still untimely discovery production, all in violation of the Court's Order compelling production (ECF No. 33), which, following discovery conferrals, resulted in Plaintiffs' currently pending Motion for Sanctions. Meireles Decl. at ¶ 33; ECF No. 34. Defendant's extensive engagement in the litigation process and utilization of Court resources belies and waives any claim to have entered into an enforceable settlement months ago. Meireles Decl. at ¶ 33.

33. On or about March 4, 2026, Defendant's counsel Attorney Kreiner contacted Plaintiffs' counsel Attorney Shavitz to reengage in settlement discussions. Shavitz Decl. ¶ 14. During the call Attorney Kreiner advised if Plaintiffs would consider a settlement fund in the $700,000 "range" (up from $660,000 as discuss *supra*), Defendant would "consider" that; and Defendant would ask that Plaintiffs send them an updated settlement counteroffer in writing *Id*. On March 10, 2026, Attorney Kreiner again contacted Attorney Shavitz requesting a written settlement counteroffer, which Plaintiffs provided later that day. *Id*.; Exhibit 10 (e-mail) at pp. 1, 11-12. Instead of responding, Defendant filed its Motion. Shavitz Decl. ¶ 14; Meireles Decl. at ¶ 34.

34. On March 25, 2026, a week after Defendant filed this Motion, Defendant's counsel Attorney Kreiner again called Plaintiffs' counsel Attorney Shavitz to discuss settlement. Shavitz Decl. ¶ 15. While reiterating Defendant's position that the Parties had already reached a resolution, Attorney Kreiner requested yet another settlement counteroffer from Plaintiffs to the extent Plaintiffs would settle for "a few more shekels" in lieu of preparing and filing this Brief. *Id*. Plaintiffs instead suggested another mediation rather than further, direct communications. *Id*. Attorney Kreiner

suggested, "maybe." *Id*.

35.     The next day, March 26, 2026, Plaintiffs wrote that rather than responding to any further requests for settlement offers, they were willing to hear any further counterproposals. Meireles Decl. at ¶ 36; Exhibit 11 (e-mail) at p. 2. Defendant wrote, "we will have a counter offer sent in writing[.]" Exhibit 11 (e-mail). at 1.

36.     On March 31, 2026, Defendant wrote purporting to claim its "response [and] any further discussion about terms does not waive or alter [Defendant's] position on the enforceability of the prior settlement," but otherwise providing counteroffer changing countless material terms, including the monetary amount; reducing the weeks at issue; changing the scope of the liability period and associated release; change to the settlement administrator selection; changes to the allocation formula; changes to the approval venue; and reducing attorneys' fees (for the first time). Meireles Decl. at ¶ 37. Plaintiffs are yet to respond. *Id.*

******

In summary, the Parties' settlement discussions were singularly focused and premised upon the workweeks at issue—an understood 10,889 weeks for a three-year limitations period. After agreeing upon a dollar amount—$660,000—the Parties set about negotiating the material terms of a resolution, exchanging several offers and counteroffers. The negotiations derailed, however, after Defendant's attempted "bait and switch" when it belatedly disclosed dramatically, materially different workweek information. The Parties never reached agreement on the material terms necessary to resolve collective action litigation. This Court should deny Defendant's Motion.

///
///
///
///
///

10

### III. ARGUMENT AND ANALYSIS

#### A. <u>The Parties Have Not Reached an Agreement.</u>

##### 1. Applicable standards[8]

"Before enforcing settlement, the district court must conclude that agreement has been reached on all material terms." *Foss v. City of New Bedford*, 621 F. Supp. 3d 203, 210 (D. Mass. 2022). This is true whether the agreement is in writing, or an oral agreement. *Maccarone v. Siemens Indus.*, 165 F.4th 640, 644 (1st Cir. 2026); *United States ex rel. Allen v. Alere Home Monitoring, Inc.*, 355 F. Supp. 3d 18, 24 (D. Mass. 2019) ("[p]arties do not become contractually bound until they mutually assent to bind themselves to an agreement" with respect to the necessary, material terms (internal quotations omitted)). In either event, "[t]he load-bearing element of a contract is the mutual assent of the parties to the essential terms of the agreement, the so-called 'meeting of the minds.'" *Metcalf v. Bay Ferries Ltd.*, 110 F. Supp. 3d 302, 303 (D. Mass. 2015). In that regard, "the district court only retains the power to enforce complete settlement agreements; it does not have the power to sit as a final arbiter and impose a settlement agreement where there was never a meeting of the parties' minds." *Foss*, 621 F. Supp. 3d at 210 (internal quotation omitted).

"A term or provision is 'material' if it is an essential and inducing feature of the contract[.]" *Id.* at 211 (internal citations and quotations omitted). In the context of an FLSA collective action, courts consider material terms to include, among other things: (i) monetary value of the settlement, (ii) the number of those to be included in the settlement, and the related scope of the release as may be different for plaintiffs versus opt-in plaintiffs; (iii) the timing of funding of the settlement; (iv) the claims administration process; (v) the allocation to collective members; (vi) the

---

[8] "In a federal court, such a motion -- at least when the underlying cause of action is federal in nature -- is determined in accordance with federal law." *Malave v. Carney Hosp.*, 170 F.3d 217, 220 (1st Cir. 1999).

tax allocation of settlement payments; and (vii) the venue for approval and enforcement purposes. *Belk v. Le Chaperon Rouge Co.*, No. 18 Civ. 1954, 2020 U.S. Dist. LEXIS 117985, at *6 (N.D. Ohio July 6, 2020) (incorporating by reference all of these material terms, as read into the record at *id.* at ECF No. 81 (transcript of necessary, material terms)).

The fact that the parties may have reached an agreement as to monetary amount is irrelevant—where all material terms have not been agreed upon, there can be no enforceable settlement. *Foss*, 621 F. Supp. 3d at 209 (declining to enforce settlement where the parties agreed upon monetary terms but disputed whether agreement on all other terms had been reached). "[A]n agreement to make a good faith effort to come to a formal agreement [is not enforceable.] . . . [The] parties either have a complete, enforceable settlement agreement, requiring no further negotiation on any material point, or they have no settlement agreement at all." *Malek v. Verizon Communs., Inc.*, No. 2 Civ. 30164, 2004 U.S. Dist. LEXIS 976, at *8 (D. Mass. Jan. 27, 2004).

### 2. The Parties did not agree as to *all* material terms.

Defendant asks this Court to "enforce" an alleged "oral settlement" which not even Defendant can attest was inclusive of all terms material to FLSA collective action. *See Belk*, *supra*; *see also* n. 4, *supra*. Moreover, with respect to the handful of terms Defendant *claims* the Parties agreed upon, some of which Defendant cannot even aver to in a sworn declaration to support such claims,[9] Defendant cannot articulate the specifics of the terms allegedly *orally* agreed upon. Tellingly, rather than averring in a sworn declaration to the specifics of the oral terms for the Court to enforce, Defendant refers the Court to a subsequent draft Term Sheet (showing countless edits and comments in dispute) as "evidence" of those specifics. Motion at 7; Exhibit 6. This is fatal to Defendant's allegation that the material terms were fully discussed and *all* agreed upon orally.

---

[9] *See* Motion at 7, claiming the parties orally agreed to the "tax allocation and liability," without citing to a sworn declaration and/or providing *any* evidence in support of the assertion.

Moreover, even had the Parties orally reached agreement on the specifics of *some* material terms, it certainly was not *all* material terms, as reflected in edited term sheets (*see* Exhibit 7) (reflecting numerous terms Defendant does not even attempt to claim the Parties orally finalized), and discussed over countless subsequent calls and e-mails (Meireles Decl. at ¶¶ 20-36; Shavitz Decl. at ¶¶ 11-17; Exhibits 5-11)).  This includes as recently as **yesterday**, March 31, 2026, when Defendant sent **another counteroffer**.  Meireles Decl. at ¶ 37.  Yet, the absence of agreement on any *one* of these material terms is fatal to the Motion.  *See Clark v. Mitchell*, 937 F. Supp. 110, 113 (D.N.H. 1996) (declining to enforce agreement where only two material terms were yet to be agreed upon); *see also Foss*, 621 F. Supp. 3d at 210 ("district court only retains the power to enforce *complete* settlement agreements[.]" (emphasis in original) (citations omitted)).

Here, countless material terms were not agreed orally or subsequently written agreement.

**Material Term 1: Scope included in the fund:**  While the Parties agreed to an amount of $660,000, the amount was *always* premised on a specific number of workweeks—10,889 based on a three-year limitations period.  "Here, there can be no question that the issue of [weeks included in the settlement] was essential to both parties to the litigation." *Foss*, 621 F. Supp. 3d at 211.  The issue of workweeks as a basis for settlement discussions was addressed *ad nauseum* for *months*, to the point it resulted in mediation being rescheduled multiple times while the Parties worked through the number of workweeks on which to premise a settlement, which is why Plaintiffs included an escalator provision in their proposed Term Sheet to increase the monetary amount if it ever came to light that there were more than 10,889 workweeks.  Exhibit 6 at p. 2, ¶ 2.  To suggest the number of weeks was immaterial is disingenuous at best.[10]

---

[10] At most, Defendant can claim its misrepresentation of workweeks was a "mistake," resulting in a "misunderstanding" between the parties as to the weeks at issue.  Fatal to Defendant's Motion, "[u]nder First Circuit law, [] there is no meeting of the minds between the parties because of a mistake of fact[.]" *Metcalf v. Bay Ferries Ltd.*, 110 F. Supp. 3d 302, 303 (D. Mass. 2015) (citing *Enos v. Union Stone, Inc.*, 732 F.3d 45, 48 (1st Cir. 2013)); *see also*

Moreover, while "it is undisputed that the parties reached agreement on the monetary amount of a settlement" (albeit, clearly without a meeting of the minds as to the weeks to be included in the at figure), "it is also undisputed that [Defendant] attempted to include additional terms [ ], which were never accepted or otherwise agreed to by the plaintiff," as further addressed *infra*, foreclosing a finding of mutual assent as to all material terms. *Foss*, 621 F. Supp. 3d at 205, 207 (refusing to enforce settlement because, after agreeing upon a monetary amount, "during the telephone calls between the parties respective counsel, [defendant] indicated that any final settlement would need" to include additional terms, with subsequent correspondence indicating further negotiations over terms); *see also Metcalf*, 110 F. Supp. 3d at 303 (refusing to enforce settlement after agreement on the monetary terms was achieved, as the parties did not resolve all other material terms); *see also Confederate Motors, Inc. v. Terny*, 831 F. Supp. 2d 414, 422-23 (D. Mass. 2011) ("at most Terny had proposed a settlement 'along [the] lines' of returning the 505,000 shares and executing mutual releases, but he had never indicated that these would be the only terms of a settlement agreement").

**Material Term 2: The liability period and associated release:** The scope of the liability period is part and parcel to the number of workweeks in the settlement, and in that regard, is fundamental. Importantly, the scope of the liability period defines the "Relevant Period" (Exhibit 7 at p. 2, ¶ 3), which itself affects the scope of the release (*id.* at p. 3, ¶ 9 ). It is axiomatic that the

---

*Arias v. Family First Funding, LLC*, No. 23-1226, 2025 LX 244820, at *33 (D.N.J. July 1, 2025) (no meeting of the minds "[w]here there is a misunderstanding between the parties pertaining to one of the material terms of an agreement"); *Cherenfant v. Carb/Americas, Inc.*, No. 05 Civ. 61256, 2006 U.S. Dist. LEXIS 113812, at *31-32 (S.D. Fla. May 3, 2006) (in FLSA matter, no meeting of the minds in light of mistaken understanding regarding a material term). While Defendant cites to *La Fleur v. C.C. Pierce Co.*, 398 Mass. 254 (Mass. 1986) for the contrary position, its reliance is severely misplaced. In *La Fleur*, a personal injury case regarding whether a release can be invalidated after learning the injury was more extensive than originally thought, the court noted that where "[t]he mistake [] involve[s] a fact capable of ascertainment at the time the contract was entered into," for example, the number of workweeks at issue which, mistake will invalidate an agreement. *Id.* at 258. If Defendant's representation of 9,200 weeks as a "likely overestimate" was a mistake, any alleged meeting of the minds on this term would be invalid as it now appears Defendant was capable of determining approximately 20,000 weeks at issue. *See also Vasconcellos v. Arbella Mut. Ins. Co.*, 67 Mass. App. Ct. 277, 280, 280-82 (Mass. 2006), upon which Defendant also relies (noting that where there is a meeting of the minds on all terms, an agreement is enforceable; yet agreement can be invalidated based upon a "misrepresentation of fact" during settlement negotiations). Workweeks is but one of many material terms, none of which were agreed to.

14

scope of the release is fundamental to any resolution. *See, e.g., Metcalf*, 110 F. Supp. 3d at 303 (settlement unenforceable despite agreement on monetary terms given dispute over release's scope).

As it relates to the scope and definition of the Relevant Period, at no point did the Parties ever discuss including a longer limitations period for *all* states; nor does Defendant ever aver that they did. Yet, Defendant's counterproposal at Exhibit 6 raises this issue for the first time, defining the "Relevant Period" to include the longer of the federal three-year period or *any state's limitations period* (*id.* at p. 2, ¶ 3; *see also* Exhibit 7 at p. 2, ¶ 3). This essentially was a rejection of whatever "agreement" the Parties may have allegedly had. *Davis v. Deutsche Bank Nat'l Tr. Co.*, No. 12-11738-JCB, 2015 U.S. Dist. LEXIS 192504, at *7 (D. Mass. July 27, 2015) ("When Deutsche Bank presented Davis with the term sheet in its April 21, 2014 email, Davis' response constituted a rejection of Deutsche Bank's offer and created a counteroffer.").

As it implicates the release's scope, "[c]ontrary to [Defendant's] conclusory allegations, the attorneys' back and forth oral and written communications regarding the terms of the release establish beyond any doubt that there was never an agreement as to the release terms based on [Defendant's] proposal[.]" *See Metcalf*, 110 F. Supp. 3d at 303 (no settlement despite agreement on monetary terms given dispute over release's scope); *D'Agostino v. Fed. Ins. Co.*, 969 F. Supp. 2d 116, 129 (D. Mass. 2013) ("decision to send a Release containing additional material terms rendered its response a counteroffer"); *see also*, Defendant's own caselaw, *Maccarone*, 165 F.4th at 642 (1st Cir. 2026) (only enforcing agreement where, among other things, the parties **agreed** upon the **scope of the release**); *see also Quint v. A.E. Staley Mfg. Co.*, 246 F.3d 11, 14 (1st Cir. 2001) (same).

**Material Term 3: Timing of settlement payments:** The manner, timing, and amount of funding is fundamental to the monetary terms agreed upon. *See Belk v. Le Chaperon Rouge Co.*, *supra*. Defendant does **not** claim the Parties orally agreed upon this term. Rather,

through its term sheet proposals, Defendant's counteroffer rejected the timing of payment, and whether it would pay the entire $660,000 or only the amounts claimed by opt-in plaintiffs. Exhibit 6 at p. 2, ¶ 4; *see also* Exhibit 7 at p. 2, ¶ 4 (Plaintiffs' subsequent proposals). This material term was yet to be agreed upon, prohibiting enforcement of any alleged agreement. *See* Defendant's own case law, *Maccarone v. Siemens Indus.*,165 F.4th 640, 642 (1st Cir. 2026) (only enforcing settlement where the parties agreed, among other things, that defendant "would pay [plaintiff] a sum certain within approximately thirty days after execution[.]")

**Material Term 4: Settlement Administrator:** The settlement administrator is a fundamental material term in an FLSA collective action. *See Belk v. Le Chaperon Rouge Co.*, *supra*. Defendant again does not claim the Parties ever reached an oral agreement on this term. Rather, via term sheet proposals, Plaintiffs initially proposed they be permitted to select the administrator; Defendant rejected this. Exhibit 6 at p. 3, ¶ 5. The term remains opened. Exhibit 7 at p. 3, ¶ 5.[11]

**Material Term 5: Allocation of individual settlement shares:** Defendant admits this term is material. Motion at 7 (defining as material, "[t]he basis on which opt-in class members would be paid"). Defendant also admits that it provided a counteroffer regarding the allocation formula via its edited term sheet. Motion at 7, n. 2; *see* Exhibit 6 at p. 3, ¶ 6). The fact that Defendant allegedly later chose "not pursue that edit" (Motion at 7, n. 2), is news to Plaintiffs, but ultimately, irrelevant. Plaintiffs did not accept the counter. *D'Agostino*, 969 F. Supp. 2d at 131 (changes to a term are considered a counteroffer); *Davis*, 2015 U.S. Dist. LEXIS 192504, at *7 (same).

**Material Term 6: Tax allocation on settlement payments:** Defendant admits this is a fundamental, material term. Motion at 7 (defining as material the "tax allocation and liability"); *see also Ikossi v. St. Mary's Reg'l Med. Ctr.*, No. 22 Civ. 00023, 2025 LX 255503, at *1 (D. Me. July

---

[11] Relatedly, Defendant never claims the specific notice administration process was discussed and/or orally agreed upon. Rather, its first appearance is in the subsequent, proposed Term Sheet. Exhibit 4 at p. 2, ¶ 7.

11, 2025) (refusing to enforce settlement agreement the parties "fail[ed] to agree on how payments to be made to Plaintiff would be allocated between lost wages and compensatory damages"). Once again, notwithstanding Defendant's factually unsupported representation to the contrary (*see* n. 8, *supra*), Defendant's counterproposal on the draft Term Sheet disputes Plaintiffs' proposed tax allocation (Exhibit 6 at p. 3, ¶ 8 ("What 1099 designation?")), resulting in additional discussion and negotiation (*see* Exhibit 7 p. 3, ¶ 8 (providing the basis for suggested 1099 allocation). This material term has not been finalized.

**Material Term 7: Venue for settlement approval:** Defendant admits this is a fundamental, material term. ECF No. 35-1 ("key terms" include "transfer of the matter"). Again, the record reflects Defendant's redlined counterproposal (Exhibit 6 at p. 4, ¶ 14) and the Parties' ongoing disputes regarding this term (Exhibit 7 at p. 4, ¶ 14). *D'Agostino*, 969 F. Supp. 2d at 131 (changes to a term considered a counteroffer); *Davis*, 2015 U.S. Dist. LEXIS 192504, at *7 (same).

### 3. Defendant was clear that there had been no agreement reached.

The extended record reflects the utter lack of any agreement, orally, in writing, or otherwise, which Defendant itself admits throughout the record. Exhibit 5 at pp. 1-2 ("we are close"); Exhibit 6 at p. 1 ("[w]e still have one person reviewing on our side – so subject to that, but hopefully we are close. . . . I suspect a formula for payout is going to take some thought."); *see Foss*, 621 F. Supp. 3d at 210 (no settlement where "counsel would need to review the specific terms [ ] before Foss would agree"). The record is clear: the Parties were negotiating over material terms via draft Term Sheets.

Under similar circumstances (albeit, where an oral agreement *had* first been reached, unlike here), the court in *Malek v. Verizon Communs., Inc.*, declined to enforce an oral settlement agreement which defendant claimed was subsequently reflected in a written document. The defendant argued the "written Settlement Agreement encapsulates the parties' oral understanding and, therefore, that

the *document* should be enforced as drafted by Verizon." *Malek*, 2004 U.S. Dist. LEXIS 976, at *9.

However, "the court [could not] enforce the written Settlement Agreement. The reason [was] simple.

The written proposal materially changed the terms upon which the parties had orally agreed. . . . Put

differently, the Settlement Agreement constituted a new offer by Verizon, Plaintiff rejected that offer

and, as a result, no agreement exists. *Id.* at *10. Likewise here, even had the Parties agreed to all

material terms orally—they did not—the subsequent exchange of proposal among the Parties with

respect to material terms prohibits enforcement of any alleged oral agreement.

"Here, the parties did not reach mutual assent with respect to **all** necessary material terms to

form the basis of an agreement, whether oral, written, or otherwise." *United States ex rel. Allen*, 355

F. Supp. 3d at 25 (emphasis added). Defendant's Motion must be denied.

**4. The Parties' conduct during and after settlement negotiations demonstrates they had not reached a resolution.**

Probative of Defendant's true belief as to the enforceability of this alleged agreement, is

Defendant's actions while the case had been purportedly "settled." "In determining whether there

was mutual assent, the parties' post-negotiation conduct may provide persuasive evidence that an

agreement was reached at an earlier time." *Commonwealth Sch., Inc. v. Commonwealth Acad.*

*Holdings LLC*, 994 F.3d 77, 85 (1st Cir. 2021); *see also United States ex rel. Allen*, 355 F. Supp.

3d at 24 (Courts determine mutual assent and a "meeting of the minds," "not on the basis of what

goes on inside the parties' heads, but rather on the basis of what they say and do.") (quoting *Salem*

*Laundry Co. v. New Eng. Teamsters & Trucking Indus. Pension Fund,* 829 F.2d 278, 280 (1st Cir.

1987). Here, even if the Court did not have the breadth of documentary evidence demonstrating the

Parties never reached an agreement, the Parties' course of conduct certainly speaks for itself.

Following the impasse regarding the counterproposals on the Term Sheet, the Parties

continued to discuss the scope of the settlement and the workweeks at issue, with Defendant offering

to pull additional data to support its preferred monetary term. However, once it was ultimately disclosed that there were, in fact, more than double the weeks represented, the ruse ended.

At that point, the Parties continued to press on with litigation. Defendant had every opportunity to bring this Motion months ago or otherwise seek to stay the litigation. Had it done so and was successful, it would have saved this Court significant resources in having to address the issues raised to date. Instead, it continued to participate in conferences both among the Parties and with the Court, has responded to discovery (albeit, extremely deficiently and in violation of the Court's order), and has participated in filings. Additionally, and most tellingly, Defendant continued to solicit new settlement offers from Plaintiff, as recently as multiple times this very month.

These are not the actions of a litigant who believes a case to have been settled.

\*\*\*\*\*

Defendant cannot articulate the material terms orally agreed upon with any specificity. Instead, it points to subsequent draft Term Sheets as evidence, which are riddled with redlined edits and counteroffers from both sides. Its conduct after the alleged "oral agreement" is not reflective of resolution, but a party actively defending itself in an unsettled litigation. The Parties did not reach an oral, or subsequent written agreement, on *all* material terms. Defendant's Motion must be denied.

## B. Even If An Agreement Were Enforced, It Is Unlikely Any Court Would Find This Resolution To Be Fair And Reasonable Under These Circumstances.

Parties are required to submit FLSA collective action settlements to a court for approval. *Mongue v. Wheatleigh Corp.*, No. 18 Civ. 30095, 2024 LX 220459, at \*15 n.3 (D. Mass. Apr. 16, 2024). "Courts may approve an FLSA settlement if the parties agreed to it and if it represents a fair and reasonable resolution," based on a "totality of the circumstances." *Preston v. World Travel Holdings, Inc.*, No. 23 Civ. 12389, 2024 U.S. Dist. LEXIS 123879, at \*12-13 (D. Mass. July 15, 2024) (internal quotations omitted). This includes, among other things, whether the potential for

fraud was present during negotiations (*id.* at \*12-13); and whether "the relief provided for the class is adequate . . . [as] compare[d] to the class members' potential recovery." *Anderson v. Team Prior, Inc.*, No. 19 Civ. 00452, 2021 U.S. Dist. LEXIS 162626, at \*14, 16-17 (D. Me. Aug. 27, 2021) (denying settlement when considering "factors supporting approval of a Rule 23 settlement" as appropriately considered for FLSA collective action settlements). "In addition, [for approval to be granted,] at least one named plaintiff must be willing to sign the agreement." *Id.* at \*13, 16 (noting approval is appropriate where the parties "fairly [and] honestly" negotiate settlement).

Even if the alleged "oral settlement" were enforced, it is *highly unlikely* any court would grant approval under these circumstances. First, Defendant's (mis)representations of no more than 9,200 workweeks (as an "overstatement") certainly raises to the level of potential fraudulent misrepresentation and/or fraudulent inducement, the specter of which could never serve as the basis for a finding of fairness. Likewise, the significant dilution of the per workweek settlement value in light of the more than doubling of the scope at issue prohibits finding that relief is adequate as compared to potential recovery. Exhibits 12-14 (Declarations of Named Plaintiffs Perez, Velasquez, and Jarvis, respectively), at ¶¶ 4-6. Finally, given these circumstances, none of the named Plaintiffs will be willing to sign any document capturing this alleged (sham) oral agreement. *Id.* at ¶ 6.

Ultimately, granting settlement approval under these circumstances would encourage every employer to understate the weeks at issue during settlement discussions to reduce the settlement value, only to later try to include and release significantly more workweeks at issue. That is antithetical to the concept of a "fair and reasonable" resolution of an FLSA collective action claim. Even if Defendant's Motion were successful, it would ultimately fail at the settlement approval stage.

## IV. CONCLUSION

The Parties did <u>not</u> agree on <u>all</u> terms, orally or later in writing. The Motion must be denied.

Respectfully submitted this 1 day of April, 2026, by:

/s/ Paolo C. Meireles
Paolo Meireles*
Tamra Givens*
SHAVITZ LAW GROUP, P.A.
622 Banyan Trail, Suite 200
Boca Raton, FL  33431
(561) 447-8888
pmeireles@shavitzlaw.com
tgivens@shavitzlaw.com

Hillary Schwab (BBO# 666029)
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3261
hillary@fairworklaw.com

*Pro Hac Vice Admitted

**Attorneys for Plaintiffs and the Putative Collective and Class**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on this date I electronically filed the foregoing document with the clerk of court using the Court's CM/ECF system which will automatically send email notification of such filing to all counsel of record.

Dated: April 1, 2026

<u>*s/ Paolo Meireles*</u>
Paolo Meireles*
Tamra Givens*
SHAVITZ LAW GROUP, P.A.
622 Banyan Trail, Suite 200
Boca Raton, FL  33431
(561) 447-8888
pmeireles@shavitzlaw.com
tgivens@shavitzlaw.com

Hillary Schwab (BBO# 666029)
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3261
hillary@fairworklaw.com

***Pro Hac Vice* Admitted**

**Attorneys for Plaintiffs and the Putative Collective and Class**